## Commonwealth of Kentucky v. Louisville Public Library, etc.

## Board of Education of the City of Louisville v. Louisville Public Library, etc.

(Decided January 8, 1913.)

### Appeals from Jefferson Circuit Court, (Chancery Branch, First Division.)

1. Trusts—Creation of—No Certain Form Required in—Parol Proof.—There is no certain form required in the creation of a trust. In the case of personal property or choses in action, trusts may be proved by parol. If the declaration be in writing, it is not essential, as a general rule, that it should be in any particular form; it may be couched in any language which is sufficiently expressive of the intention to create a trust.

2. Trusts—What Raises a Trust—Any agreement or contract in writing, made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property, or a certain fund shall be held or dealt with in a particular manner for the benefit of another, raises a trust, in a court of equity, in favor of such other person against the person making such agreement.

3. Trusts—Creating Trust—When Will Not Be Treated as Invalid for Want of Consideration.—Where the author of a gift retains the legal dominion over the subject of the gift in himself, but fully and completely declares himself to be trustee of the property for the purposes indicated, he will be treated as a trustee, and the object of his bounty will be given the benefit of the trust. In all such cases the declaration of trust is considered in a court of equity as equivalent to an actual transfer of the legal interest in a court of law, and if the transaction by which the trust is created be complete it will not be treated as invalid for want of consideration.

4. Trusts—Divestiture of Equitable Title.—A complete divestiture of equitable title may be produced by a clear and unambiguous declaration to that effect, although a further disposition of the legal title was still in contemplation.

5. Trusts—Creation by Legislature of Library Association—Transfer of Books and Property to New Library—Termination of Trust by New Library at Will.—Where a Library Association, created by an act of the legislature for the purpose of furnishing a library to the people of a city, subsequently transferred all of its books and personal property, and the rents of its realty, to a public library, owned and controlled by the city, for a period of 99 years, the Old Library Association merely holding the legal title for the use and benefit of the New Library Association, the Old Library Association thereby made itself a trustee of a dry or passive trust, which the New Library Association might terminate at will, by requiring a transfer to it of the legal title..

6. Trusts—Continuation of—Termination.—A trust will not be continued merely that the trustee may continue to receive compensation from it. If the *cestuis* desire its termination it will not be maintained for the benefit of the trustee.

7. Escheat—Property of Library Association—When Not Subject to Escheat.—Where the legal title to property is held by one library association in trust for the use and benefit of another library association, which took over the duties of the first association, and continued to use the property for library purposes, the property is not subject to escheat upon the ground that the first named library has ceased to use its property for library purposes, since the equitable title to the property is in the successor or active library association, which continues to use it for library purposes.

BENJAMIN F. WASHER, ARTHUR E. HOPKINS and McQUOWN & BECKHAM, for the Commonwealth.

RICHARDS & HARRIS, and ARTHUR M. RUTLEDGE, for the Board of Education.

BENNETT H. YOUNG, JOHN J. DAVIS and CLAYTON B. BLAKEY, for the Louisville Free Public Library.

GRUBBS & GRUBBS, for Mutual Life Insurance Co. of New York.

OPINION OF THE COURT BY JUDGE MILLER—AFFIRMING.

These two actions were instituted for the purpose of escheating the real estate held by the "Polytechnic Society of Kentucky" for the use of the "Louisville Public Library," fronting 136 feet on the east side of Fourth street south of Green street, in Louisville, Kentucky. In order to accurately comprehend the legal questions presented, it becomes necessary to give a brief history of the title to the property, and its use.

In 1871, the "Public Library of Kentucky" was incorporated by a special act of the legislature, which gave it the right to raise money by means of a lottery, in the form of five entertainments, at which a portion of the proceeds arising from the sale of tickets should be

devoted to the purpose of the library. By means of this lottery the "Public Library of Kentucky" acquired $427,396.32.

In 1878, by another special act, the legislature incorporated the "Polytechnic Society of Kentucky," hereinafter called the "Polytechnic Society," for brevity. Section 3 of this act provided that the objects of the "Polytechnic Society" should be "The establishment of a public and circulating library, and maintenance thereof; the printing and publication of papers or works illustrative of the history of Kentucky, or literature and science, the encouragement of original (research), and the diffusion of knowledge."

Section 4 of said act, after providing that the corporation might acquire and hold by gift, purchase, loan, devise, or otherwise, books, pamphlets, periodicals, papers and minerals to be used as a library and museum, and might acquire and hold in fee, or otherwise, grounds and buildings in which to keep and preserve its library and museum, contained this further clause: "PROVIDED, That if the 'Public Library of Kentucky' shall make any gift, sale, or transfer of property to the said 'Polytechnic Society,' such gift, sale or transfer shall include all moneys, choses in action, claims, demands, and right of action belonging to said 'Public Library of Kentucky,' either at law or in equity."

Section 6 of said original charter of 1878 reads as follows:

"The society shall lease, if practicable, such portions of its building or buildings as may not be required for its purpose; and the money so received for rent shall go into the general fund of the society, and the money received from any source whatsoever shall go into the general fund; and the general fund shall be used—first, to defray necessary current expenses; second, to pay the interest on any outstanding bonds or other indebtedness. The surplus remaining at the end of any fiscal year shall be used to further the "objects of the society and liquidate its outstanding debts."

And, finally, section 12 of said act of 1878, contained the following clause:

"In case this charter or corporation shall lapse for non-user or other cause, any property that may be owned by the corporation shall escheat to the Commonwealth of Kentucky, and pass under the supervision of the State Librarian."

The original charter of the "Polytechnic Society of Kentucky" of 1878, was amended by acts passed in 1880 and 1882. Section 2 of the amendment of 1882, enlarged the purposes of the original charter, to some extent, in the following terms:

"The objects of this society shall be the cultivation and diffusion of knowledge by maintaining a free reference library, a circulating library, and courses of popular lectures; by collecting, preserving, and arranging in its libraries and cabinets whatever may illustrate history, science, literature, the arts or other branches of useful knowledge, and especially the history, topography, geology, paleontology, zoology, botany, mineralogy, and the sociology and industries of Kentucky, and by organizing and maintaining, as may be deemed expedient, academies or classes in science, art, literature, philosophy and technology."

Section 12 of the amendment of 1882 repeated, *verbatim*, the clause contained in section 12 of the original act of 1878, providing for an escheat to the Commonwealth for non-user, or other cause.

It is evident from the clause copied above from the fourth section of the original charter of 1878 of the "Polytechnic Society," that it was contemplated that said society would take over the property of the "Public Library of Kentucky," and become its successor. This purpose further appears from section 5 of said act, which authorizes the society to borrow as much as $100,000.00 to be used in the purchase or improvement of real estate for library purposes, and to mortgage its property to secure the loan.

The reorganization of the library thus contemplated was carried out on May 22, 1878, by the "Public Library of Kentucky" conveying to the "Polytechnic Society" its property, including the real estate in controversy, the title to which it has held to the present time.

Subsequently, the corporate name of the "Polytechnic Society of Kentucky" was changed to that of the "Louisville Public Library," which seems to have merely succeeded to all the rights, powers and property of the "Polytechnic Society of Kentucky," without a formal deed of conveyance.

By common consent, all the parties to this action have treated the "Polytechnic Society of Kentucky" and the "Louisville Public Library" as one corporation; and, for convenience, we will speak of it as the "Polytechnic

Society" in order to distinguish it from the "Louisville Free Public Library," which will be referred to later.

The "Polytechnic Society" took possession of the property of the "Public Library of Kentucky" in 1878, including the real estate which is the subject of this action, and maintained a library therein to November 1, 1904. In the meantime, the revenue which supported the library was acquired, for the most part, by rents from stores on the ground floor, and "Library Hall," a theater which occupied most of the second floor of the library building. In 1901 the old building was removed, and the present modern new building was erected, at a cost of several hundred thousand dollars.

By an act of March 21, 1902 (Ky. Stats., section 2801b), any city of the first class (Louisville being of that class) was authorized to use and maintain within its corporate limits a free public library; and sub-section 3 of the act gave the trustees of such free public library power to acquire by gift, purchase, or otherwise, real and personal property to the use of the public library. The city was further given power to raise money for library purposes by the levy of an annual tax of not less than $2\frac{1}{2}$ cents, nor more than 4 cents, upon each $100.00 worth of property within its boundary.

Furthermore, section 7 of said act gave the board of trustees power to acquire and hold property on the following terms:

"The board of trustees may accept such gifts and donations of property, real and personal, to be used for the purposes contemplated by this act, upon such terms and conditions not in conflict with the Constitution and laws of this Commonwealth, as may be agreed upon by the said board of trustees, of the one part, and the donor, of the other part, and the title of the property, as may be so given or donated, shall be vested in such board of trustees, and the city wherein such library may be situated may be a party to any deed or instrument of transfer for the purpose of carrying out such arrangement pertaining thereto as it may lawfully make; and for the purpose of acquiring all property "of other corporations, or libraries, or societies, as may by contract or agreement under it be transferred from such library or association to it." (Sec. 2801b Ky. Stat.)

Acting upon the authority thus conferred, Mayor Grainger, of the city of Louisville, took steps looking towards the erection of a free public library; and, with

that end in view, ne acquired for and on behalf of the city, the lot on the north side of York street, extending from Third to Fourth street, for a main library—branch libraries having been subsequently built in other portions of the city.

At the instance of the "Polytechnic Society," the legislature of 1904 passed what is called, in the record, an "Enabling Act," which authorized existing library corporations to transfer or convey their property "to the city or town in which the same is located." That act provided as follows:

"WHEREAS, In the charters of said corporations, associations or societies, it is provided that, in case said charter or corporation shall lapse from non-user or other cause, any property that may be owned by the corporation shall escheat to the Commonwealth of Kentucky, and pass under the supervision of the State Librarian, and doubt may arise whether such corporation has power or authority to transfer its property to any such city or town; therefore, any corporation, association, or society, heretofore created "for the circulation and diffusion of knowledge by maintaining free reference libraries, circulating libraries or popular lectures, or by collecting materials for the illustration of the various branches of useful knowledge, is hereby authorized and empowered upon the majority vote of its members present voting at a regular meeting or a meeting called for the purpose of considering the subject, to transfer or convey to the city or town in which the same is located, to be used by said city or town for library or educational purposes, for the benefit of all the people of said city or town, with such additional conditions as may be agreed upon by such corporations, association or society, and it shall be lawful to incorporate in such agreement conditions securing the right to nominate or appoint on the board of trustees a given number of the directors or trustees in the corporation with which such agreement may be made, and such city or town, all or any part of the property, real, personal and mixed, owned or held by said corporation, association or society, and title thereto, may be vested in said city or town or in any corporation department or branch thereof; but nothing herein contained shall be construed so as that a transfer of its property, as hereinabove provided, shall operate as dissolution of any such corporation, association, or society to terminate its existence, but the same may continue its cor-

porate existence for any of the purposes within the purview of its charter or articles of incorporation.'' (Acts 1904, p. 182.)

Availing themselves of the provisions of the act of 1902, and of the Enabling Act of 1904, the "Polytechnic Society" and the "Louisville Free Public Library" entered into a contract on November 1, 1904, by which all the personal property of the "Polytechnic Society," including its books, cabinets, museum and art gallery, passed into the possession of the "Louisville Free Public Library" for a term of 99 years, and became a part of the public library created for the benefit of the citizens of Louisville. The contract further provided that the net rents from the library property, which is the subject of this litigation, should be paid to the "Louisville Free Public Library." After the execution of this contract, the "Louisville Free Public Library" maintained and operated the library of the "Polytechnic Society," with such additions thereto as it bought from time to time, on the fifth floor of the building upon the property now sought to be escheated, until July 15, 1908, at which time that property was vacated and the library removed to the new building of the "Louisville Free Public Library" at Fourth and York streets. At no time during the ownership of the property in question by the "Polytechnic Society" had it ever occupied the entire building on its property; a portion of it had always been rented out, and the rentals thereof applied to library purposes. This continued from 1878 to 1904, both in the old "Library Hall" building and in the new modern five-story building which was erected in 1901. This right was expressly given the corporation by its charter.

The purpose of the contract of November 1, 1904, is set forth in its preamble, which reads as follows:

"That, whereas, the said second party is proposing and has entered upon the preparation for the construction of a library building in the city of Louisville in accordance with the provisions of an act of legislature of the State of Kentucky allowing cities of the first class to provide for free public libraries, which act was approved on the 16th day of May, 1902, and,

"Whereas, the said second party is desirous of furnishing the people of Louisville with a free public library as soon as practicable upon the broadest and most liberal scale, and,

"Whereas, the said first party owns a large and valu-

able property consisting of its grounds and buildings on the east side of Fourth street between Green and Walnut streets, in Louisville, Kentucky, about sixty-three thousand volumes of books, cabinets, statutary, paintings, botanical, geological and mineralogical specimens and curios of various kinds and other property, and,

"Whereas, the members of the Louisville Public Library, said party of the first part, desire insofar as possible to do the greatest good to the greatest number of people in Louisville, Kentucky, and to make the best use of the property and things under its control for the public use and welfare, and,

"Whereas, the property and resources of the said first party, although large, are not sufficient to provide fully for the wants and necessities which are to be met, and which the said second party is organizing for the purpose of meeting,

"Now, therefore, this contract, etc."

The first section of the contract provided that the personal property so turned over to the "Louisville Free Public Library" should "remain in possession of, and under the care, supervision, management and control of the second party exclusively," and should be used as a part of its free library and museum; and, by section 9 the contract further provided that this personal property might "be used by the said party of the second part for the purposes hereinafter set forth, *as though it owned the same,* for said purposes." It will thus be seen that, under the contract of November 1, 1904, all the personal property of the "Polytechnic Society" was turned over absolutely to the "Louisville Free Public Library," to be under its exclusive control and management, and to be used by it for its own purposes, just as if it were the owner, for a period of 99 years, and with the express right to sell such parts of it as it could not use.

It is admitted by counsel for the Board of Education, that so far as the personal property is concerned, this might be considered as a substantial compliance with the Enabling Acts of 1902 and 1904, since the "Louisville Free Public Library" was virtually given the title along with the possession and use of the personal property. It contends, however, that so far as the contract relates to the real estate in controversy, it did not comply with the Enabling Acts. In the meantime the "Polytechnic Society" had, on June 24, 1907, mortgaged the property in question to the Mutual Life Insurance Company, of

New York, for the sum of $310,000.00, due in five years thereafter. Of this money $76,000.00 had been used in the equipment and furnishing of the new building of the "Louisville Free Public Library" at Fourth and York streets, and for furnishing and equipping the branch libraries of the "Louisville Free Public Library."

The property and store on Fourth street is now occupied by the Kaufman-Straus Company as a dry goods store, under an annual rental of $36,000.00; and, after paying the interest upon the mortgage, repairs and necessary charges and expenses, the net balance of this rent is turned over to the "Louisville Free Public Library." During the past several years this net rent has ranged between $5,500.00 and $8,000.00 annually.

On December 11, 1911, the Commonwealth, by its revenue agent, brought the first of these actions, to escheat the real property on Fourth street lately occupied by the library of the "Polytechnic Society" and now occupied by the Kaufman-Straus Company; and, on January 22, 1912, the Board of Education of the city of Louisville brought the second suit for the same purpose. The chancellor dismissed both actions, and the plaintiff in each action prosecutes an appeal.

Preliminary to the discussion of the merits of the case, appellee insists that the Commonwealth has no right to prosecute this action, because the right to escheat, if it exists at all, is in the Board of Education of Louisville by virtue of section 2971 of the Kentucky Statutes, and found in the charter of cities of the first class, which provides that property in such a city, which shall escheat to the Commonwealth for any cause, shall vest in the Board of Education for the use and benefit of the public schools. And, appellee further contends there can be no right of escheat for non-user of the franchise of the "Polytechnic Society" until there has been a direct proceeding by the State to forfeit the charter, and a judgment of forfeiture entered. These questions, however, need only be considered in case it be first determined that the property in question is subject to escheat; for, if for any reason, it be not so subject, it becomes unnecessary to determine which of the plaintiffs is entitled to maintain the suit, or whether either suit has been prematurely brought. We will, therefore, take up the question whether, under the facts above set forth, and the law applicable to such cases, the Fourth-street realty is subject to escheat.

Escheat is claimed under section 192 of the Constitution and section 567 of the Kentucky Statutes enacted in compliance with the constitutional provision.    Section 192 of the Constitution reads as follows:

"No corporation shall engage in business other than that expressly authorized by its charter, or the law under which it may have been or hereafter may be organized, nor shall it hold any real estate, except such as may be proper and necessary for carrying on its legitimate business, for a longer period than five years, under penalty of escheat."

Section 567 of the Kentucky Statutes is almost identical in terms with the constitutional provision, and reads as follows:

"No corporation shall engage in business other than that expressly authorized by its articles of incorporation or amendments thereto; nor shall any corporation, directly or indirectly, engage in or carry on in any way the business of banking, or insurance of any kind, unless it has become organized under the laws relating to banking and insurance; nor shall any corporation hold or own any real estate, except such as may be necessary and proper for carrying on its legitimate business, for a longer period than five years under penalty of escheat."

It is insisted by the appellant that the "Polytechnic Society" has ceased to hold and use the property in question for the purpose of carrying on and conducting a library business for which it was created; that the contract of November 1, 1904, made between the "Polytechnic Society" and the "Louisville Free Public Library" amounts neither to the conduct of a library by the "Polytechnic Society" nor a compliance with the Enabling Act of 1904; and, that since 1904 the "Polytechnic Society" has abandoned the property for every corporate use and purpose.    On the contrary, appellees contend that the contract of November 1, 1904, under which the "Polytechnic Society" passed over all its personalty and the net rents of its realty to the "Louisville Free Public Library" constitutes the operation of a library under the charter, and is, at the same time, a compliance with the Enabling Act of 1904.    In other words, the appellees treat the contract of 1904 as valid, since it provides for the conduct of the "Polytechnic Library" through the agency of the "Louisville Free Public Library."    The chancellor agreed neither with the appellants nor with the appellees; but treated the con-

tract of 1904 as a covenant of the "Polytechnic Society" to stand seized of all the property therein conveyed to the use of the "Louisville Free Public Library," and that section 192 of the Constitution and section 567 of the Kentucky Statutes, *supra,* do not apply to real estate held by a corporation merely as trustee for another corporation, where such real estate is necessary and proper for the corporate purposes of the latter, which was found to be true in this case. While we concur in the conclusion reached by the chancellor that the property in question was not liable to escheat, we think he should have gone further and based his decision upon the ground that the "Polytechnic Society" being merely the trustee of a dry trust, all the rights in this property formerly held by the "Polytechnic Society" are now in the "Louisville Free Public Library."

If the effect of the contract of 1904 was to pass the entire beneficial interest of the property in question to the "Louisville Free Public Library," by whom it is now undoubtedly held and used for library purposes, leaving the "Polytechnic Society" merely the trustee of a dry trust, it does not come within the purview of the constitutional or statutory provisions concerning escheat. The question, therefore, is, whether the use and title did so pass to the "Louisville Free Public Library;" and the answer depends upon the effect to be given to the contract of November 1, 1904.

That no particular formality is required or necessary in the creation of a trust, is elementary. All that is required is evidence supplying every essential detail of the trust. Thus, in Perry on Trusts, section 82, it is said:

"Any agreement or contract in writing, made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property, or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him voluntarily or with notice."

And, in section 96, the same author, in speaking of agreements without consideration, says:

"And where there is *no valuable consideration,* yet if the settlor, by a clear and explicit declaration, duly executed and intended to be final and binding upon him, makes himself a trustee, courts of equity will enforce

the trust, whether the nature of the property be legal or equitable, and whether it be capable or incapable of trans-fer. If it is a mere agreement, without consideration, to execute a declaration of trust, courts will not act upon it; but if a party has declared himself to be a trustee, the beneficial interests in the property becomes vested in the *cestui que trust* without further action, and the *cestui que trust* can enforce his rights."

In Helfenstein's Estate, 77 Pa., 328, 18 Am. Rep., 449, the court said:

"The is no prescribed form for the declaration of a trust. Whatever evinces the intention of the party that the property of which he is the legal owner shall bene-ficially be another's is sufficient. V. C. Sir W. Page Wood said, in Richardson v. Richardson, L. R. 3 Eq., 686: 'The real distinction should be made between an agreement to do something when called upon, something distinctly expressed to be future in the instrument, and an instrument which affects to pass everything, inde-pendently of the legal estate.'"

In Smith's Estate, 144 Pa., 27 Am. St. Rep. 641, 22 Atl. 916, it is said:

"There is no certain form required in the creation of a trust. In the case of personal property or choses in action, trusts may be proved by parol. If the declaration be in writing, it is not essential, as a general rule, that it should be in any particular form. It may be couched in any language which is sufficiently expressive of the intention to create a trust. The intention must be plainly manifest, and not derived from loose and equivocal ex-pressions of parties, made at different times and upon different occasions; but any words which indicate with sufficient certainty a purpose to create a trust will be effective in so doing. It is not necessary that the terms 'trust' and 'trustee' should be used. The donor need not say in so many words, 'I declare myself a trustee,' but he must do something which is equivalent to it, and use expressions which have that meaning; for, however anxious the court may be to carry out a man's intention, it is not at liberty to construe words otherwise than according to their proper meaning."

In the English case of Heartley v. Nicholson, 19 Eq., 233, Vice Chancellor Bacon stated the rule as follows:

"It is not necessary that the declaration of a trust should be in terms explicit; but what I take the law to require is that the donor should have evinced, by his acts

which admit of no other interpretation, that he himself has ceased to be, and that some other person has become, the beneficial owner of the subject of the gift or transfer, and that such legal right of it, if any, as he retained, was held in trust for the donee. 'The one thing necessary,' says the same learned judge in Warriner v. Rogers, L. R. 16 Eq. 340, 'to give validity to a declaration of trust—the indispensable thing—I take it to be that the donor, or grantor, or whatever he may be called, should have absolutely parted with that interest which had been his up to the time of the declaration; should have effectually changed his right in that respect, and put the property out of his power—at least in the way of interest.' ''

In Taylor v. Henry, 48 Md. 550, 30 Am. Rep. 486, and Milholland v. Whalen, 89 Md. 212, 44 L. R. A., 205, 43 Atl. 43, it is said:

"The cases go the length of maintaining that, where the author of the gift retains the legal dominion over the subject of the gift in himself, but fully and completely declares himself to be trustee of the property for the purposes indicated, there he will be treated as trustee, and the object of his bounty will be given the benefit of the trust. In all such cases the declaration of trust is considered in a court of equity as equivalent to an actual transfer of the legal interest in a court of law, and if the transaction by which the trust is created be complete, it will not be treated as invalid for want of consideration."

In Lane v. Ewing, 31 Mo. 75, 77 Am. Dec. 632, the Court said:

"It seems to result from the nature of such a transaction that a complete divestiture of equitable title might be produced by a clear and unambiguous declaration to that effect, although a further disposition of the legal title was still in contemplation. And all the cases agree that, even in the case of a trust created or continued in the party from whom the bounty emanates, the transaction must show that the entire equitable interest is parted with."

Tested by these authorities, the contract of November 1, 1904, seems to fully meet every requirement for the creation of a valid trust. The requirement of the law that the donor should have evinced, by his acts, which admit of no other interpretation, that he has ceased to be, and that some other person has become the beneficial owner of the subject of the gift or transfer, and that whatever legal right he has retained was held in trust

for the donee, as was laid down in Heartley v. Nicholson, supra, is fully complied with.

The "Polytechnic Society" has not only passed all of its property, including the income of the real estate in controversy, to the "Louisville Free Public Library," practically in perpetuity, but it has further agreed that when the property is sold and the mortgage made by the "Polytechnic Society" has been paid, whatever remains shall be delivered to the "Louisville Free Public Library," is to be used by it for library purposes, and in any way that it may think best.

Clearly, the effect of that contract was to divest the "Polytechnic Society" of all of its property. It actually delivered its personal property to the "Louisville Free Public Library," and only retained the title to the realty, holding it, however, for the sole use and benefit of the "Louisville Free Public Library." It retained no power of revocation; it retained no substantial use of the property, in any shape or form. In fact, it parted with all of its property, and retained only the title to the real estate, which it held in trust for the beneficiary, the "Louisville Free Public Library." In carrying out the purpose of the contract, it had theretofore expended $76,000.00 of the proceeds of its mortgage in the equipment of the buildings belonging to the "Louisville Free Public Library," thus treating the latter as the owner of the property.

Moreover, the trust thus created is not an active trust; it is a mere passive or dry trust, which the beneficiary can terminate at pleasure. Where an estate is held under what is called a simple or dry trust, the rule is well settled that such a trust will be vacated upon the demand of the beneficiary, and the trustee required to convey to him the legal title. Dembitz on Land Titles, section 20; Page on Wills, section 615.

It is a well established rule in equity that a conveyance of land from A. to B. to the use of or in trust for C., the trustee having no active duty to perform, constitutes a passive, or dry trust, and the trustee takes no title, but the same vests immediately and absolutely in the beneficiary to the extent of the estate granted. 4 Kent Comm. 288; McGoon v. Scales, 9 Wall 23.

In Bispham's Equity, section 54, the rule is stated as follows:

"A passive (or, as it is sometimes called, a simple) trust has been defined to be a trust in which the property

is vested in one person upon trust for another, and the nature of the trust, not being qualified by the settlor, is left to the construction of the law. In this case the *cestui que trust* had *jus habendi*, or right to be put in actual possession of the property, and *jus dispodendi*, or the right to call upon the trustee to execute conveyances of the legal estate as the *cestui que trust* directs.''

In Perry on Trusts, section 920, the rule is stated as follows:

''A trust will not be continued merely that the trustee may continue to receive compensation from it. If the *cestuis* desire its termination it will not be maintained for the benefit of the trustee. When the purposes named in the trust which are inconsistent with the full beneficial ownership and control of the *cestui* are fulfilled, so that the trustee holds the property on a simple trust, the *cestui* having the absolute equitable ownership of the fund, he is entitled to have the trust terminated.''

The scope of this rule will be readily seen from an examination of a few cases which have applied it.

In Rogers v. Sisters of Charity, 97 Md. 550, Hoover and wife conveyed two tracts of land to the Sisters of Charity of St. Joseph, a corporation empowered to hold real estate, in trust for the use and benefit of St. Vincent's Female Orphan Asylum, a corporation also authorized to acquire and hold real estate. In considering the effect of these deeds the court said:

''There are no active duties of any kind prescribed. In the absence of such duties, if the deeds are deeds of feoffment, the statute of uses at once executed the legal estate in the *cestui que trust,* and that corporation, the Saint Vincent Orphan Asylum, was immediately vested with a fee simple estate, upon the delivery and recording of the deeds. The design, object and purpose of the parties to the deeds are evident. The consideration is nominal. No beneficial interest was conveyed to the Sisters of Charity. The orphan asylum was clearly intended to be the real owner of the property. On the face of the deeds all of this is apparent.''

The court there held the fee simple title had vested in the orphan asylum, and that it had the right and might convey a valid title thereto.

In Smith's Estate, 144 Pa. St., 434, heretofore referred to, the court said:

''Almost all trusts are in a certain sense executory. Ordinarily, a trust cannot be executed except by convey-

ance; there is, in most cases, something to be done. But this is not the sense in which a trust is said to be executory. An executory trust, properly so called, is one in which the limitations are imperfectly declared, and the donor's intention is expressed in such general terms that something not fully declared is required to be done, in order to complete and perfect the trust, and to give it effect. When the limitations of a trust are fully and perfectly declared, the trust is regarded as an executed trust. Egerton v. Browklaw, 4 H. L. 210; Cushing v. Blake, 30 N. J. Eq. 689; Pomeroy's Eq. Jur., section 1001.''

In Holmes v. Walter 118 Wis., 418, 62 L. R. A. 986, the court said:

''The condition which will render an express trust inoperative and carry the legal with the equitable title direct to the intended beneficiary, is possession and enjoyment by him of the primary use. If there is vested in the trustee, however, some duty to perform, merely as regards the title, which may be performed consistent with that being in the beneficiary subject to performance of such duty, the statute executes the use just the same, merging the legal with the equitable title in the beneficiary, the trust, as a mere power, remaining effective under the statute on the subject of powers.''

In Hill v. Hill, 90 Neb. 43, 132 N. W. 738, a testator devised his estate to ''John W. Hill, Jr,, in trust for my lawful heirs—to be held by said trustee for the term of five years,'' and then to be distributed. The heirs claimed the estate at once; and in upholding their claim, the court. said:

''The trust created was passive, vesting in the trustee a dry, naked title; the effect being, so far as the real estate is concerned, if the statute of uses were part of the law of this State, to vest immediately the legal title, as well as the beneficial use, in the *cestuis que trustent*,'' citing Woolley v. Preston, 82 Ky., 415.

And, in answer to the argument that the statute of uses was not in force in Nebraska, the court further said:

''In that event, the power of the chancellor to compel the trustee to account for, and, if he had no duty other than to hold the legal title to the estate, to require him to deliver over that estate to his *cestuis que trustent* would be unquestioned. Lewin, Trusts (11th ed.) pp. 16, 849.''

In Prince v. Prince, 162 Ala., 114, 49 So., 873, the

beneficiary under a dry trust was permitted to sue alone, for injury to the estate, the court saying:

"The action is to recover the penalty for willfully and knowingly cutting trees on land of the plaintiff (appellant) the court below excluded the conveyance offered to show title in the plaintiff, and this on the sole ground that the legal title vested thereunder in the trustee named in the instrument. The conveyance created only a dry, naked trust, raised no duties for the trustee, and hence, under our statute (Code 1896, section 1027, and its predecessors) vested in the beneficiary, the plaintiff, the legal estate in the real estate conveyed. You v. Flynn, 34 Ala., 409; Jordan v. Phillips, 126 Ala., 561. There can be no doubt that the grantors intended Mary Prince to be the beneficiary under the conveyance. This was error, to reverse the judgment below."

The rule has been recognized, in its broadest application, in Kentucky. Woolley v. Preston, 82 Ky., 415; Adams' Trustee v. Adams, 21 Ky. L. R., 1756, 56 S. W., 151; Fink v. Metcalfe, 26 Ky. L. R., 1263, 83 S. W., 643; City of Louisville v. Anderson, 27 Ky. L. R., 143, 84 S. W., 573.

As was said in Woolley v. Preston, 82 Ky., 423: "The trustees have no possible interest. Why, then, allow them to retain the naked legal title, which should operate only to defeat the beneficial use of the estate expressly given to the devisee."

In Hawthorne v. Root, 6 Bush, 501, 506, where the purposes of an executed trust were about to be defeated by the inability of the trustee, who was a minor, to aid in the execution of the trust, the court invalidated the deed, using this language:

"To permit appellees to hold the estate would be to defeat the whole objects of the grantor, and to permit them to acquire and hold a title adverse to those for whose benefit the conveyance was originally made, or to acquire and hold a title adverse to the *cestui que trust,* cannot be allowed."

So in the case at bar. The "Polytechnic Society" having substantially complied with the Enabling Act of 1904, by actually delivering its personal property to the "Louisville Free Public Library," and by conveying to that corporation the entire beneficial interest of the real estate is controversy, it will not be permitted to now say that it still holds the legal title. The "Polytechnic Society," as it now exists, has only 37 members,

and performs no duty for which it was created; on the contrary, it has passed the duty for which it was created and its property which is acquired and held for the purposes of performing that duty, to the "Louisville Free Public Library." No doctrine is more firmly established than the equitable rule which declines to continue a trust solely for the benefit of the trustee. From November 1, 1904, to February 1, 1910, the rents were collected by an officer of the "Louisville Free Public Library," and turned over to its Treasurer; but since the latter date, the rents have been collected by the "Polytechnic Society." If it should fail to account for the net rents of this realty, a bill for an accounting would lie against it, under the terms of the contract. It maintains a paper organization, by holding annual meetings, and paying a Secretary $50.00 annually for mere nominal services. It performs no duty for which it was created; on the contrary, by section 3 of the contract of 1904, it reserved the right to retain $300.00 annually out of its rents "for the purpose of paying the expense and maintenance of its organization." But the only remaining purpose of the organization is to nominate to the Mayor one director annually for the "Louisville Free Public Library," and to require it to provide a "study room" in its library building for the use of the members of the "Polytechnic Society," to the exclusion of the general public. The members of the "Polytechnic Society" have equal rights and privileges with the general public in the use of the "Louisville Free Public Library." The net result, therefore, of the compromise contract of 1904 is, that the "Polytechnic Society" has surrendered its duties and obligations as trustee, and secured a special privilege to its 37 members. It has proceeded upon the untenable theory that it has rights separate and apart from its rights as a trustee for the public benefit, and that these individual and public rights can be segregated and exercised independently of each other. The law does not tolerate such an anomolous distinction. When a trustee for the public use surrenders its work, it should surrender the means given it to perform that work.

As a corporation having duties, the "Polytechnic Society of Kentucky" is a mere retrospection, without any purpose or reason for its existence, except the single purpose of withholding this real estate from those whom it admits, are entitled to the use of it. At the end of the contract in A. D. 2003, if the "Polytechnic Society" be

then in existence, and its charter not forfeited by the Commonwealth for *non-user*, what will it do with this realty? Such of its books as may have survived a century's further use, would be of little aid in starting a library. How will it supply the literary output of the intervening century, which would be absolutely necessary for the successful operation of a library? In the meantime, the "Louisville Free Public Library," supported by taxation, will have fully filled the field for which the "Polytechnic Society" was created. In view of these considerations the conclusion cannot be avoided, that it was the intention of the parties to the contract of 1904, that the "Louisville Free Public Library" should relieve the "Polytechnic Society" of all its duties to the public. The Enabling Act of 1904 contemplated that result; and in complying with the act, the "Polytechnic Society" will not be permitted to relieve itself of its duty to the public, and at the same time retain the mere legal title to a part of the property, which was given it, through the instrumentality of the Commonwealth, for the purpose of performing its duty. If it or its successor the "Louisville Public Library" fails to formally convey the realty in question to the "Louisville Free Public Library," that corporation may compel a conveyance, by a proper proceeding. In the meantime, however, the "Polytechnic Society" or the "Louisville Public Library" as its successor, holds the legal title in trust for library purposes as administered by the "Louisville Free Public Library;" and, as that corporation is performing its duty as a library association, the property in question is not subject to escheat.

Judgment affirmed; the whole court sitting.